## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| MARGIE WALDROP, on Behalf of Herself and All Others Similarly Situated, | Civil Action No.: 3:16-cv-706-GNS |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| HUMANA, INC. and HUMANA PHARMACY SOLUTIONS, INC., | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Margie Waldrop ("Plaintiff"), by and through the undersigned counsel for her Class Action Complaint against Defendants Humana, Inc. and Humana Pharmacy Solutions, Inc. (collectively, "Defendants"), states and alleges as follows:

## INTRODUCTION

1.     Plaintiff, on behalf of herself and all others similarly situated, brings this action against Defendants to recover monetary damages, injunctive relief, and other remedies resulting from Defendants' common fraudulent and deceptive pricing scheme to artificially inflate prescription copayment amounts ("copayment" or "copay") causing consumers to pay more than they otherwise would on purchases of medically necessary, covered prescription drugs.

2.     About 90% of all United States citizens are now enrolled in private or public health insurance plans that cover some, or all, of the costs incurred for medical and pharmaceutical benefits.  A feature of most of these plans is the shared cost of prescription drugs. Normally, when a plan participant fills a prescription for a medically necessary, covered prescription drug under his or her health care plan, the plan pays a portion of the cost and the plan participant pays the remaining portion of the cost directly to the pharmacy in the form of a

copayment or coinsurance.  Merriam-Webster defines a copayment as "a small fixed fee that a health insurer (as an HMO) requires the patient to pay for certain covered medical expenses (as office visits or prescription drugs)."[1]  Pharmacies are required by contract to collect the copayment on Defendants' behalf from the plan participant at the time the prescription is filled and are not allowed to waive or reduce the copayment collected.

3.      Defendants are health insurance companies along with pharmacy benefit managers ("PBMs").  The PBMs are either owned or retained by the health insurance companies, on behalf of the plan or third-party payors, to provide the pharmacy benefits to plan members, which includes, *inter alia*, establishing a formulary of drugs that will be covered, a network of pharmacies that will serve as participating pharmacies for plan participants to obtain their prescriptions, copayment amounts, coinsurance amounts, and deductibles (if applicable).  In this instance, Defendant Humana, Inc. owns the PBM, Defendant Humana Pharmacy Solutions, Inc., that provides the pharmacy benefit to Plaintiff.

4.      As set forth below, Defendants and their co-conspirators, which include other insurance companies who utilize Humana Pharmacy Solutions, Inc., have engaged in a scheme to defraud plan members by artificially inflating the copayment of medically necessary prescription drugs well above the cost of the drug.  Plan participants, including Plaintiff and the Class (defined below), pay inflated copayments to participating pharmacies in exchange for receiving their prescription drugs.  Unbeknownst to the plan participants, Defendants artificially inflate the purported costs of the prescription drugs in the form of increased copayments and then "claw back," or recoup, from the pharmacies a large portion of the copayments.

---

[1]      *See Co-payment*, MERRIAM-WEBSTER (2016), http://www.merriam-webster.com/dictionary/co%E2%80%93payment (last visited Nov. 8, 2016).

5.      Defendants utilize the U.S. Mail and interstate wire facilities to engage in their fraudulent billing scheme.  Defendants represent to plan participants that their copayment amount is based on some portion of the actual cost for the drug, when, in fact, plan participants pay more than the actual cost of the drug and Defendants simply pocket the overpayment in the form of prescription claw back.  Defendants represent to the pharmacies that they are clawing-back the increased copayment amount because consumers overpaid for their prescriptions. However, Defendants never disclose this to plan participants, nor do they reimburse plan participants for their supposed overpayments.  The amounts Defendants claw back from the copayments are pure, undisclosed profit for Defendants.

6.      The costs incurred by plan members resulting from Defendants' fraudulent scheme can be significant.  For example, when a consumer pays a $10 prescription copayment to the pharmacy for a medically necessary, covered prescription drug, as required under the consumer's health benefit plan, the acquisition cost of the drug may be only $3.  The PBM then reduces the pharmacy's reimbursement for the claim for this prescription by $6 as an adjustment to the original claim.  In this scenario, the PBM has "clawed back" $6 of the $10 copay. Ultimately, the pharmacy is reimbursed $4 (all from the consumer copayment) making only $1 over the cost of the drug, while the Defendants fraudulently retain $6 – which they do not pass back to the plan participant.

7.      In order to implement Defendants' fraudulent scheme, Defendants' contracts with participating pharmacies require the pharmacists not to disclose the existence of the claw back or the fact that a plan member could, in certain circumstances, pay more as a copayment for a prescription drug than if the plan member did not have insurance.  Pharmacies are often subject to "gag clauses" in their contracts, prohibiting them from advising plan participants that she or he

could pay less for a drug if the purchase is made without applying the pharmacy insurance benefit.

8.     Defendants fraudulent scheme to artificially inflate the copay for medically necessary, covered prescription drugs and then surreptitiously retaining those excess amounts jeopardizes the entire pharmaceutical delivery system.  For one, consumers are paying higher amounts than they otherwise would had Defendants not artificially inflated the copayment amounts; as for many of these drugs, the cost without insurance would be only slightly over acquisition cost.  Therefore, consumers believe that they are saving money through the use of their pharmacy benefit, when, in reality, they have been charged an excessive amount for the prescription.  The pharmacy believes that it is being reimbursed a reasonable amount for the prescriptions it fills for consumers, only to have a large portion of it clawed back by Defendants.  And, the plan participant believes she or he is paying a copayment based on the prescription drug's true cost, but instead is paying an inflated cost for the prescription.

9.     Class members are consumers who pay artificially inflated copayments for medically necessary, covered prescriptions that cost plan participants more than if they did not have insurance.  Indeed, the very purpose of obtaining insurance and having pharmacy benefits is to enable plan members to receive the purported benefits of the insurance company and PBMs through the insurance company's and PBMs' negotiating and buying power with prescription drug manufacturers, which is supposed to result in reduced costs for prescription drugs, costs for administration, and overhead of their pharmacy benefit.

10.     As a result of Defendants' fraudulent scheme, Defendants overcharged Plaintiff and the other Class members for prescription drugs during the Class Period (defined below).

Defendants' misconduct has caused Plaintiff and the other Class members to suffer significant damages.

## PARTIES

### A.    Plaintiff

11.    Plaintiff Margi Waldrop is a citizen of the State of Alabama during the Class Period, Plaintiff participated in a Medicare Advantage Part D health plan offered by Humana, Inc. and Humana Pharmacy Solutions, Inc. and utilized Defendants' pharmacy benefit to obtain prescriptions for medically necessary, covered prescriptions and paid copayments for such prescriptions.   As described in detail below, as a result of Defendants' fraudulent scheme, Plaintiff has been injured by paying inflated copayments for medically necessary, covered prescriptions.

### B.    Defendants

12.    Defendant Humana, Inc. offers, among other things, health insurance products and services and network-based health and well-being services to beneficiaries and other government-sponsored health care programs.  Humana, Inc. is a Delaware corporation with its principal place of business located at 500 West Main Street, Louisville, Kentucky 40202.

13.    Defendant Humana Pharmacy Solutions, Inc. is a wholly-owned subsidary of Humana, Inc. with its principal place of business located at 500 West Main Street, Louisville, Kentucky 40202.  Humana Pharmacy Solutions, Inc. provider pharmacy benefit solutions serves as a PBM for millions of individuals throughout the United States.  Humana Pharmacy Solutions, Inc. represents that it "provides you and your employees with the benefits and services you really

want – guaranteed costs with no suprises, a variety of plan options and pricing strategies, plus ongoing reliability you can count on that always puts patient care first."[2]

## JURISDICTION AND VENUE

14.     This Court has jurisdiction pursuant to 28 U.S.C. §1331, as claims are brought under federal statutes and necessarily involve adjudication of one or more federal questions. This Court also has jurisdiction pursuant to 18 U.S.C. §1964(a), which states that the "district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962."

15.     This Court also has jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. §1332(d)(2), (5) because: (i) the Class has more than 100 members; (ii) the amount at issue exceeds five million dollars, exclusive of interest and costs; and (iii) minimal diversity exists, as Plaintiff and Defendants are citizens of different states.

16.     This Court has personal jurisdiction over Defendants because Defendants conduct business in Kentucky and this District, have their principle executive offices and provided prescription drug services in Kentucky and this District, have advertised, marketed, and promoted their services in this District, and have sufficient minimum contacts within Kentucky and/or sufficiently availed themselves of the markets in Kentucky and this District to render the exercise of jurisdiction by this Court permissible.

17.     Venue is proper in this District under 28 U.S.C. §1391(a)-(d) because, *inter alia*, substantial parts of the events or omissions giving rise to the claim occurred in this District and/or a substantial part of property that is the subject of the action is situated in this District.

---

[2]     *Humana Pharmacy Solutions*, HUMANA.COM (2016), https://www.humana.com/agent/products-and-services/pharmacy/solutions/ (last visited Nov. 11, 2016).

## FACTUAL BACKGROUND

### A.    Prescription Drug Coverage

18.    Over 90% of health care beneficiaries in the United States have a health care plan (either private or public) that covers all, or a portion of, their medical and pharmaceutical expenses.  Few plans cover all expenses, but instead, require plan participants to pay a portion of their drug costs out-of-pocket.   These out-of-pocket expenses include copayments, co-insurance, and/or deductibles.

19.    Even though plan participants cannot, and do not, negotiate the price charged by pharmacies for prescription drugs and do not negotiate the copayment price for the drug in a given transaction; they are required to pay the pharmacy a predetermined copayment amount in order to receive the prescription.

20.    Plan participants pay health insurance premiums, either directly or through an employer deduction, to a third-party payor for the purpose of insuring against healthcare costs, including prescriptions.

21.    In the context of Medicare, consumers pay a premium and obtain prescription drug coverage by enrolling in a Medicare Prescription Drug Plan (Part D).  According to the official U.S. Government site for Medicare: "Medicare Prescription Drug Plans (Part D): These plans (sometimes called "PDPs") add drug coverage to Original Medicare, some Medicare Cost Plans, some Medicare Private Fee-for-Service (PFFS) Plans, and Medicare Medical Savings Account (MSA) Plans."[3]

22.    Medicare Prescription Drug Plans ("PDPs") provide pharmacy benefits to their Part D enrollees and serve as middlemen between drug manufacturers and/or pharmacies and the

---

[3]    *How to get drug coverage*, MEDICARE.GOV (2016), https://www.medicare.gov/sign-up-change-plans/get-drug-coverage/get-drug-coverage.html (last acessed Nov. 11, 2016).

plans members that pay for drug prescriptions.   Medicare PDPs contract with the U.S. Government to offer prescription drug benefits along with numerous services, including developing a pharmacy network, formulary design, negotiating drug rebates, drug utilization review, and processing and analyzing prescription claims.

23.    In a typical situation, where a benefit plan participant seeks to fill a drug prescription, the role of the Medicare PDP is illustrated as follows: the insured consumer visits a network pharmacy; the pharmacy checks with the Medicare PDP to confirm consumer eligibility, coverage, and copayment information; the consumer pays the copayment (and any deductible) and purchases the drug; the Mediacre PDP then reimburses the pharmacy for the remainder of the negotiated drug price, including the ingredient cost and a dispensing fee less the copayment; and the Medicare PDP then bills the U.S. Government for the payments it made, pursuant to the terms of the contractual agreement between the Medicare PDP and the U.S. Government.

### B.    How Prescription Drug Prices Are Set

24.    The common pricing benchmark for virtually all retail drug reimbursement transactions is the "Average Wholesale Price" ("AWP").   AWP represents the manufacturer's published catalog or list price for a drug product.   Commercial publishers of drug pricing data, such as Red Book and First DataBank, have published AWP data since the 1970s.   AWP is used to determine drug prices and third-party reimbursement throughout the healthcare industry.

25.    The AWP may be determined by several different methods.    The drug manufacturer may report the AWP to the individual publisher of drug pricing data.   The AWP may also be calculated by the publisher based upon a mark-up specified by the manufacturer that is applied to the wholesale acquisition cost ("WAC") or direct price ("DP").   The WAC is

the manufacturer's list price of the drug, when sold to the wholesaler, while the DP is the manufacturer's list price, when sold to non-wholesalers.

### C.  Defendants' Copayment Claw Back Scheme

26.    Consumers purchase health insurance to protect them from unexpected high medical costs, including prescription drug costs.  Plan participants, including Plaintiff and the Class, at a minimum, expect to pay the lower than uninsured or cash-paying individuals for a prescription.  Otherwise, they would receive no benefit from their insurance plan, and would, in fact, be punished for having insurance.  Therefore, plan participants reasonably expect to pay less for prescription drugs than cash-paying customers who do not have insurance coverage.

27.    Plaintiff is enrolled in a Medicare Advantage Part D health plan that is underwritten and issued by Humana, Inc.  Plaintiff's health plan is contained in a standard form contract that provides a pharmacy benefit for outpatient prescription drugs.  Plaintiff's health plan further provides that she is responsible to pay the applicable copayment with respect to medically necessary, covered prescription drugs.

28.    Medicare defines a copayment as "[a]n amount you may be required to pay as your share of the cost for health care services, like a doctor's visit, or prescriptions. A copayment is usually a set amount, rather than a percentage. For example, you might pay $10 or $20 for a doctor's visit or prescription."[4]

29.    A copayment is a type of insurance payment where the insured pays a specified amount that is usually a fraction of the total costs with the insurer paying the remaining costs. Copayments are usually a set amount based on the type of prescription drug.  Prescription drugs are usually tiered according to price.  For example, a three-tier prescription drug plan may

---

[4]    *Supporting Information: Glossary*, MEDICARE.GOV (2016), https://www.medicare.gov/find-a-plan/static pages/glossary/planfinder-glossary.aspx (last visited Nov. 11, 2016).

require a higher copay for each tier.  Thus, with a three-tier copay, a consumer may pay a $7 copay for a Tier 1 categorized prescription drug, a $12 copay for a Tier 2 categorized prescription drug, and a $47 copay for a Tier 3 categorized prescription drug.  The tiering of copays is standard in insurance policies and normally reflective of the costs for the prescription drugs, *i.e.*, the higher the cost of the drug, the higher the copay.  However, evidence from numerous pharmacies show that Defendants are charging inflated copays that exceed the costs of the drugs.

30.    Plaintiff has been a victim of Defendants' prescription drug claw back scheme. Specifically, during the Class Period, Plaintiff has paid copayments for medically necessary, covered prescription drugs at her local pharmacy where Defendants have improperly inflated the price of the prescription drug copayment and then clawed back a portion of the copayment charged to Plaintiff.[5]

31.    On September 22, 2016, Plaintiff filled a prescription at her local network pharmacy for a medically necessary, covered drug.  The pharmacy submitted the prescription drug claim and Defendants adjudicated the claim, requiring the pharmacy to charge Plaintiff a $20.32 copayment for the prescription.  However, unbeknownst to Plaintiff, Defendants, through Humana Pharmacy Solutions, Inc., artificially inflated the cost of the prescription and clawed back $5.00 of the copayment from the pharmacy.

32.    Plaintiff believes that she has been subjected to additional undisclosed clawbacks as a result of Defendants' scheme.

33.    As demonstrated above, Defendants have engaged in a fraudulent scheme to inflate prescription copayments significantly above the amounts for the cost of the drugs.

---

[5]        To protect Plaintiff's privacy, Plaintiff is not providing the specific prescription drugs that were submitted to Defendants, as Defendants already possess such information.  To the extent requested, Plaintiff will provide such information to the Court and Defendants under seal.

Defendants have required pharmacies to collect these inflated copayments and then have clawed back or recouped a portion of the copayments that the pharmacies collected.

34.     Neither the copayment amount paid by the plan participant nor the amount clawed back by the Defendants appear to have any relationship to the contractual provisions of the plan, AWP, wholesale price, WAC, or any other terms of reimbursement.

35.     Plaintiff's investigation reveals that Defendants' claw back scheme is pervasive and is occurring with numerous prescription drugs, including Phentermine, Alcortin, Bystolic, Estrogen, Vitamin D and medically necessary, covered prescription drugs.

36.     Another instance of Defendants' claw back scheme is shown through the following document image regarding the prescription drug Guaifenesin, which is a cough medicine.  This image demonstrates how the claw back works.  It shows the cost of the drug, including tax and the pharmacist's fee, is $6.67, but also reveals the pharmacy had to charge the customer a copayment of $11.67.  The remaining $5.00 was sent back to the Medicare PDP.  The image below taken from an article from Fox 8 News entitled "Copay or you-pay? Prescription drug clawbacks draw fire" describes how the PBM claws back a significant portion of the copay for Guaifenesin.[6]

---

[6]     *See* Lee Zurik, *Copay or you-pay? Prescription drug clawbacks draw fire*, FOX8LIVE.COM (May 4, 2016, 3:10 PM), http://www.fox8live.com/story/31891070/zurik-copay-or-you-pay-prescription-drug-clawbacks-draw-fire (last visited Nov. 8, 2016).



```
                          ** PAID CLAIM INFORMATION **
Patient                                
ADDR:                                   
Drug: GUAIFEN/COD SOD AC SOLN 100-10/5   Qty: 120 NDC:  00121-0775-16
Cvg: SMD        Phone: 800-865-8715             Ref#: A535715592110l
Rx# 1177896     Date: 11-11-15    Trans. Date: 11-11-15   Time: 16:16
                     Transmitted     Received    Difference
Cost                    12.09           4.92         7.17  ( 59.31%)
Fee                     15.00           1.75
Tax                                     0.00
Cost+Fee+Tax            27.09           6.67         0.00   Acq Cost
Copay                                  11.67-
Amt.Paid                                5.00-

Benefit Stage Qualifier               Benefit Stage Amount
                                                      11.67

Insurance Information

Group ID:
Plan ID:
Network Reimbursement ID:
Payer ID Qualifier:
Payer ID:
Cardholder ID:

URL:

Patient Information

First Name:
Last Name:
Date Of Birth:
                      Optional Data Review
Plan Identification: MPREF
Network Reimbursement ID: NET-9101
Basis of Reimbursement: MAC Pricing Cost Paid to MAC Price

Addl. Resp. Msg:    CMS EXCLUDED DRUG
```

37.    Indeed, the Fox News 8 New Orleans investigation, entitled "Copay or you-pay? Prescription drug clawbacks draw fire," support Plaintiff's claim and state that Humana may be clawing back money from customers, when the customers' drugs aren't covered under the Medicare Part D program.  The Fox News 8 investigation stated that several pharmacists told Fox News 8 that the documentation they received clearly shows Humana, Inc. ordered the collection of copays that were higher than the costs of the drugs.

38.    Louisiana State Insurance Commissioner Jim Donelon questioned the legality of this practice: "It is an additional premium in my judgment, comparable to raising rates," Donelon warns. "And I think that charge constitutes a price of having insurance with whatever carrier you're insured with."  *Id*.

39.    With respect to the payment of copayments above the cost of actual cost of the prescription drug, Donelon further stated: "You could say that, if the customer is paying more than the drug is worth, it's not a copay – it's a "you-pay". "There's no copay," our pharmacist

says, "that is an absolute, additional premium being paid, that they're paying, that they don't realize." *Id.*

40.     In these instances, instead of a traditional copayment based on the actual cost of the prescription drug, patients, like Plaintiff and the Class, are unknowingly footing the entire bill for their prescriptions, whereas Defendants pay nothing and make a sizable undisclosed profit off of the consumers.

41.     Unfortunately, plan participants often do not know the true costs of their prescriptions or that there are cheaper options available.   And, many pharmacies are contractually prohibited from letting plan participants know about less expensive options.

42.     Defendants' fraudulent copayment claw back scheme results in plan participants paying more for the cost of a prescription with insurance – which defeats the entire purpose of having insurance in the first place.  Defendants do not disclose their scheme to plan participants and, in fact, disguise their scheme through contractual provisions, which make it appear that their copayments are based on, and are a portion of, the cost of the prescriptions.  Indeed, there is simply no legitimate basis for Defendants to charge for more for medically necessary, covered prescription drugs than those without insurance.

43.     Defendants' contracts with participating pharmacies require the pharmacists not to disclose the existence of the claw back or the fact that a plan member could, in certain circumstances, pay more in a copay for a prescription drug than the drug would cost the plan member if she or he did not have insurance.  Pharmacies are often subject to "gag clauses" prohibiting them from advising consumers that she or he could pay less for a drug if the purchase was made without applying the insurance benefit.

44.     Indeed, a June 28, 2016 press release issued by the NCPA described the claw

back practice and how it is impacting pharmacists and consumers throughout the United States.[7]

The press release went on to discuss a survey that was conducted by the NCPA of its members

between June 2 and June 17, 2016, which disclosed the following:

- Copay claw backs are relatively common, as 83 percent of pharmacists witnessed them at least 10 times during the past month.

- Two-thirds (67 percent) said the practice is limited to certain PBMs.

- Most (59 percent) said they believe the practice occurs in Medicare Part D plans as well as commercial ones.

- Sometimes PBM corporations impose "gag clauses" that prohibit community pharmacists from volunteering the fact that a medication may be less expensive if purchased at the "cash price" rather than through the insurance plan. In other words, the patient has to affirmatively ask about pricing. Most pharmacists (59 percent) said they encountered these restrictions at least 10 times during the past month.[8]

45.     Some of the comments received from the pharmacists who responded to the

survey included:

"Got one today. [PBM] charging a patient $125 for a generic drug and take back $65 from the pharmacy. If paid cash the cost to the patient would have been $55."

***

"Simvastatin 90-day charged the patient $30 more than cash price."

***

"[A] patient copay is over $50 and the claw back is over $30 all for a drug where our cash price would only be $15."

***

"The ones that make me the most upset is the Champ/VA claims. Seeing our disabled veterans families paying more than they should is horrific. Many times these fees are multiple times our net margin, even a negative reimbursement at

---

[7]     News Releases, NCPA, Pharmacists Survey: Prescription Drug Costs Skewed by Fees on Pharmacies, Patients (June 28, 2016), http://www.ncpanet.org/newsroom/news-releases/2016/06/28/pharmacists-survey-prescription-drug-costs-skewed-by-fees-on-pharmacies-patients (last visited Oct. 12, 2016); *see also Survey of Community Pharmacies*, NCPA (2016), http://www.ncpa.co/pdf/dir_fee_pharamcy_survey_june_2016.pdf (last visited Nov.9, 2016).

[8]     *Id.*

times. One recent copay of $30 where we sent $27.55 back to [PLAN] left our margin at $1.58."

\*\*\*

"Same patient, same day, five prescriptions. … Total copay $146.89. Total claw back $134.49. Total price of the five prescriptions $12.40. Our gross profit on these five drugs $3.79. These are all maintenance medications for this patient."

\*\*\*

"Recently filled a buproprion xl 150 script for 30 tabs. Cost is $17.15. PBM required us to charge a patient $47.10 and then took back $35."[9]

46.     Clearly, these examples of claw backs could not be possible if the true cost of the prescription drug was disclosed and the pharmacy was not prohibited by contract and threat of termination from disclosing the lower cash-paying price for these drugs.

## CLASS ALLEGATIONS

47.     Plaintiff brings this action individually and on behalf of the following Class (the "Nationwide Class"), pursuant to Rule 23 of the Federal Rules of Civil Procedure:

All individuals residing in the United States and its territories who purchased medically necessary, covered prescription drugs on Defendants' formulary at any time during the relevant statute of limitations period (the "Nationwide Class Period") and paid a copayment in excess of the prescription drug's cost.

48.     Plaintiff reserves the right to redefine the Class prior to certification.

49.     Excluded from the Class are Defendants, any of their parent companies, subsidiaries, and/or affiliates, their officers, directors, legal representatives, and employees, any co-conspirators, all governmental entities, and any judge, justice, or judicial officer presiding over this matter.

50.     This action is brought, and may properly be maintained, as a Class action pursuant to Fed. R. Civ. P. 23.   This action satisfies the numerosity, typicality, adequacy, predominance, and superiority requirements of those provisions.

---

[9]     *See Community pharmacists describe PBM copay clawbacks on patients*, NCPA.CO (2016), http://www.ncpa.co/pdf/06-27-16-copay-clawbacks.pdf (last visited Nov. 9, 2016).

51.     The Class is so numerous that the individual joinder of all of its members is impracticable.  Due to the nature of the trade and commerce involved, Plaintiff believes that the total number of Class members is in the thousands and that the members of the Class are geographically dispersed across the United States.  While the exact number and identities of the Class members are unknown at this time, such information can be ascertained through appropriate investigation and discovery.

52.     Common questions of law and fact exist, as to all members of the Class, and these common questions predominate over any questions affecting only individual members of the Class.  These common legal and factual questions, which do not vary from Class member to Class member, and which may be determined without reference to the individual circumstances of any Class member, include, but are not limited to, the following:

a.  whether Defendants' pricing of the prescription drugs was false and misleading;

b.  whether Defendants engaged in a scheme to inflate the copayment for medically necessary, covered prescription drugs;

c.  whether Defendants engaged in a pattern of deceptive and/or fraudulent activity intended to defraud Plaintiff and the Class members;

d.  whether Defendants utilized or formed enterprises for the purpose of carrying out the out-of-network reimbursement scheme;

e.  whether Defendants used the U.S. mails and interstate wire facilities to carry out the fraudulent copayment scheme;

f.  whether the Defendants used the U.S. Mail and interstate wire facilities to carry out their conspiracy and agreement;

16

    g.    whether Defendants' conduct violated the Racketeer Influenced and Corrupt Organizations Act ("RICO");

    h.    whether Defendants violated the states Consumer Protection Statute;

    i.    whether Plaintiff and the Class are entitled to compensatory damages and if so, the nature of such damages; and

    j.    whether Plaintiff and the Class are entitled to injunctive relief.

53.    Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff and all members of the Class have been similarly affected by Defendants' common course of conduct, since they all relied on Defendants' representations in the plan contract regarding their prescription drug coverage and paid copayments to their pharmacies based on those representations.

54.    Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel with substantial experience in handling complex class action litigation.  Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so.

55.    A class action is superior to other available methods for the fair and efficient adjudication of the present controversy.  Individual joinder of all members of the Class is impracticable.  Even if individual members of the Class had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.  Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by Defendants' common course of conduct.  The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy, and the fair and efficient handling of all Class members' claims in a single forum.  The

conduct of this action as a class action conserves the resources of the parties and the judicial system and protects the rights of the Class.  Furthermore, for many, if not most, a class action is the only feasible mechanism that allows an opportunity for legal redress and justice.

56.    This action is maintainable as a class action, under Fed. R. Civ. P. 23(b)(1), because individual actions by class members would create: (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants; and/or (2) adjudications that, as a practical matter, would be dispositive of the interests of other class members not parties to the adjudications, and would substantially impair or impede the ability of such non-party class members to protect their interests.

57.    This action is maintainable as a class action, under Fed. R. Civ. P. 23(b)(2), because Defendants have acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief respecting the Class as a whole.

58.    This action is maintainable as a class action, under Fed. R. Civ. P. 23(b)(3), because the common questions of law and fact identified above, without limitation, predominate over any questions affecting only individual members and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CAUSES OF ACTION
### Count I - Violation of RICO, 18 U.S.C. §1962(c)

59.    Plaintiff realleges each and every allegation contained above as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

60.    At all relevant times, Defendants are "person[s]" within the meaning of RICO, 18 U.S.C. §§1961(3), 1964(c).

61.    As described herein, Defendants Humana, Inc operated and managed Humana Pharmacy Solutions, Inc. as an enterprise to carry out their pattern of racketerring activity. Humana Pharmacy Solutions, Inc. is a legal entity enterprise pursuant to 18 U.S.C. §1961(4).

62.    The Defendants utilized Humana Pharmacy Solutions, Inc. both for the illegal conduct described herein, but also for the legal purpose of delivering prescription drug services in accordance with the law.

63.    As described herein, all of the Defendants also operated and managed as legal entity enterprises the individual pharmacies where Plaintiff and members of the Class filled their prescriptions that were subject to Defendants' illegal scheme.

64.    Defendants utilized Plaintiff's and the Class members' pharmacies both for the illegal conduct described herein, but also for the legal purpose of facilitating prescription drug delivery services in accordance with the law.

65.    In addition, at all relevant times, and as described herein, all of the Defendants carried out their claw back copayment scheme to Humana, Inc members in connection with the conduct of an association-in-fact enterprise, within the meaning of 18 U.S.C. §1961(4), comprising of Humana, Inc and Humana Pharmacy Solutions, Inc., non-defendant independent network pharmacies, and non-defendant insurance companies (collectively, "Humana Enterprise").

66.    Each Defendant is legally and factually distinct from each of the enterprises described herein.

67.    At all relevant times, the Humana Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of RICO, 18 U.S.C. §1962(c).

68.     As described herein, the Humana Enterprise has, and continues to have, an ascertainable structure and function separate and apart from the pattern of racketeering activity in which Defendants have engaged.  In addition, the members of the Humana Enterprise function as a structured and continuous unit and performed roles consistent with this structure.  The members of the Humana Enterprise performed certain legitimate and lawful activities that are not being challenged in this complaint, including the provision of health insurance and plan and claims administration services by Humana, Inc., which was done for many claims lawfully and without resort to unlawful practices.  However, the copayment claw back scheme was not legitimate, as it involved the artificial inflation of prescription drug amounts beyond the true cost of the drugs enabling Defendants to obtain additional monies that they otherwise would not be entitled to or enable to obtain.  Aside from legitimate activities carried out by the members of the Humana Enterprise, its members used the Humana Enterprise structure to carry out the fraudulent and unlawful activities alleged herein, including, but not limited to, intentional inflation of copayment amounts and the automatic recoupment, or clawing back, of these inflated copayment amounts from plan members' pharmacies.

69.     The purpose of the Defendants' use of the enterprises described herein  was to create a mechanism by which Defendants could obtain additional monies beyond the copayments from plan members for medically necessary, covered prescription drugs.  In particular, as described herein, Defendants created what appeared to be an appropriate structure between the independent network pharmacies, insurance company, and the PBMs, to provide pharmacy benefits to plan members, which includes, *inter alia*, establishing a formulary of drugs that will be covered, a network of pharmacies that will serve as participating pharmacies for plan

members to obtain their prescriptions, copayment amounts, coinsurance amounts, and deductibles, when, in fact, they were invalid.

70.     Through their roles in the scheme, Defendants benefited by artificially inflating the copayments for medically necessary, covered prescription drugs.  Defendants further used the enterprises to facilitate its goal of artificially inflating the copayments for medically necessary, covered prescription drugs.

71.     Through its wrongful conduct, as alleged herein, Defendants, in violation of 18 U.S.C. §1962(c), conducted and participated in the conduct of the enterprises' affairs, directly and indirectly, through a '"pattern of racketeering activity,'" as defined in 18 U.S.C. §1961(5).

72.     Defendants, acting through its officers, agents, employees, and affiliates, have committed numerous predicate acts of "racketeering activity," as defined in 18 U.S.C. §1961(5), prior to, and during, the Class Period and continue to commit such predicate acts, in furtherance of their claw back payment scheme, including: (a) mail fraud, in violation of 18 U.S.C. §1341; and (b) wire fraud, in violation of 18 U.S.C. §1343.  Such predicate acts include the following:

a.     by mailing, or causing to be mailed, and otherwise knowingly agreeing to the mailing of various materials and information, including, but not limited to, materially false and misleading copayment determinations, for the purpose of artificially inflating the amount of monies paid and each such mailing constituting a separate and distinct violation of 18 U.S.C. §1341; and

b.     by transmitting, or causing to be transmitted, and otherwise knowingly agreeing to the transmittal of various materials and information, including, but not limited to, materially false copayment determinations and related benefit determinations, by means of telephone, facsimile, and the Internet, in

interstate commerce, for the purpose of effectuating the above-described false copayment scheme and each such transmission constituting a separate and distinct violation of 18 U.S.C. §1343.

73.     As set forth above, Defendants made copayment determinations, which were contrary to law and its members' contracts.  Defendants knew that the copayment determinations artificially inflated the costs of medically necessary, covered prescription drugs and that Defendants would claw back, or recoup, such amounts.

74.     In furtherance of its copayment claw back scheme, Defendants, in violation of 18 U.S.C. §§1341, 1343, repeatedly and regularly used the U.S. Mail and interstate wire facilities to further all aspects of the copayment claw back scheme by delivering and/or receiving materials, including contracts, pharmacy benefit determinations, copayment determinations, and other materials necessary to carry out the scheme to defraud Plaintiff and other Class members.

75.     The foregoing communications *via* U.S. Mail and interstate wire facilities contained false and fraudulent misrepresentations and/or omissions of material facts, had the design and effect of preventing Plaintiff and the Class from learning of Defendants' improper inflation of copayments, and/or otherwise were incident to an essential part of Defendants' copayment claw back scheme to defraud.

76.     Defendants knew that their plan participants would reasonably rely on the accuracy, completeness, and integrity of disclosures by the Defendants.  Plan participants did rely, to their detriment, on misrepresentations and omissions from the Defendants.

77.     Each such use of the U.S. Mail and interstate wire facilities alleged in this complaint constitutes a separate and distinct predicate act.

78.     Plaintiff and members of the Class were injured by reason of Defendants' RICO violations because they directly and immediately overpaid for medically necessary, covered prescription drugs.   Their injuries were proximately caused by Defendants' violations of 18 U.S.C. §1962(c) because these injuries were the foreseeable, direct, intended, and natural consequence of Defendants' RICO violations (and commission of underlying predicate acts) and, but for Defendants' RICO violations (and commission of underlying predicate acts), they would not have suffered these injuries.

79.     Pursuant to §1964(c) of RICO, 18 U.S.C. §1964(c), Plaintiff and the members of the Class are entitled to recover, threefold, their damages, costs, and attorneys' fees from Defendants and other appropriate relief.

**Count II – Violation of RICO, 18 U.S.C. §1962(d)**

80.     Plaintiff realleges each and every allegation contained above as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

81.     During the Class Period, Defendants conspired with other co-conspirators, which include other unnamed insurance companies who utilize Humana Pharmacy Solutions, Inc. to engage in the claw back payment scheme, to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprises (described above) through a pattern of racketeering activity, as described above, in violation of 18 U.S.C. §1962(d).   This conspiracy to violate 18 U.S.C. §1962(c) constitutes a violation of 18 U.S.C. §1962(d).

82.     In furtherance of this conspiracy, Defendants and their co-conspirators committed numerous overt acts, as alleged above, in the pattern of racketeering described above, including the adjudication of pharmaceutical benefit determination and the required collection of inflated copayments.

83.     As a direct and proximate result, and by reason of the activities of Defendants and their conduct in violation of 18 U.S.C. §1962(d), Plaintiff and the Class have been injured in their business and property within the meaning 18 U.S.C. §1964(c) and are entitled to recover treble damages, together with the costs of this lawsuit, expenses, and reasonable attorneys' fees.

### Count III - Violation of Kentucky Consumer Protection Act Ky. Rev. Stat. §367.170

84.     Kentucky Revised Statutes §367.170 provides that: "Unfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Ky. Rev. Stat. §367.170(1).

85.     Defendants provide pharmaceutical insurance coverage to consumers, which falls within the meaning of "any trade or commerce" under Ky. Rev. Stat. §367.170.

86.     Defendants engaged into deceptive practice of materially omitting that the insured's copays actually could and would exceed the actual price of the prescription medications and that part of their co-pay would actually go to Defendants, rather than insureds' pharmacists.

87.     Defendants engaged in the deceptive practice of requiring pharmacies not to inform their customers (*i.e.*, Defendants' insureds) that it would actually be cheaper not to use insurance for the particular transactions described above.

88.     Defendants made misleading statements by labeling patients' obligation as "co-pays," when in reality the insurer, the ostensible other "co-payor," paid ***nothing*** to the pharmacy, but instead took part of patients' co-pays for itself from the pharmacy.

89.     Defendants engaged in the false pretense of making it appear that a co-pay is an amount that is less than the actual price of the prescription medicines patients would obtain from their pharmacists.

90.     These misleading statements, false pretenses, deceptive practices, and omissions were material, in that reasonable consumers would have opted not to use insurance to purchase their medicines when their "co-pays" would exceed the price of the medication available without insurance.

91.     Defendants intended that Plaintiff and consumers rely upon these unfair, false misleading or deceptive practices, and omissions, which were made in connection with the sale of insurance and pharmaceuticals in violation of Kentucky's Consumer Protection Act, Kentucky statutes, and Ky. Rev. Stat. §367.170.

92.     As a result of Defendants' violative conduct, Plaintiff and consumers have suffered damages and are entitled to injunctive and equitable relief, including but not limited to restitution and disgorgement, and an award of attorneys' fees pursuant to Ky. Rev. Stat. §367.220(3).   Defendants misleading statements, false pretenses, deceptive practices, and omissions were held out to the public at large, and many members of the public would receive relief from the success of this action.

93.     By committing the acts alleged above, Defendants have violated the Kentucky's Consumer Protection Act, Kentucky statutes, and Ky. Rev. Stat. §367.170.

94.     Defendants' representations and omissions were false, untrue, misleading, deceptive, and/or likely to deceive.

95.     Defendants knew, or should have known, that their representations and omissions were false, untrue, misleading, deceptive, and/or likely to deceive.

96.     Defendants used or employed such deceptive and unlawful acts or practices with the intent that Plaintiff and members of the Class rely thereon.

97.     Plaintiff and the other members of the Class did so rely.

98.     Plaintiff and the other members of the Class purchased the prescription drugs sold by Defendants, who misrepresented the copayment price of the prescription drugs purchased by Plaintiff and the Class.

99.     Plaintiff and the other members of the Class would not have paid as much as they did for the prescription drugs, but for Defendants' deceptive and unlawful acts.

100.    As a result of Defendants' conduct, Plaintiff and the other members of the Class sustained damages in amounts to be proven at trial.

101.    In accordance with Kentucky's Consumer Protection Act, Kentucky statutes, Ky. Rev. Stat. §367.170, Plaintiff seeks an order: (1) enjoining Defendants from continuing to conduct business through its deceptive conduct; (2) requiring Defendants to conduct a corrective advertising campaign; (3) ordering Defendants to implement whatever measures are necessary to remedy the untrue, misleading, or deceptive business acts or practices; (4) awarding Plaintiff and the Nationwide Class costs, including reasonable attorney's fees; and (5) ordering such other relief as may be just and proper.

**Count IV – Fraud**

102.    Plaintiff realleges each and every allegation contained above as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

103.    Defendants materially misrepresented and/or concealed the true copay prices of prescription drugs.  Defendants made such misrepresentations and/or omissions by reporting artificially inflated copay prices for such drugs to Plaintiff and members of the Class.

104.    Defendants made these misrepresentations and omissions knowingly, or at least with reckless disregard of their falsity, given that Defendants knew the copay prices that they

reported to Plaintiff and members of the Class were substantially (and unjustifiably) higher than the prices that would be charged to cash-paying customers.

105.    Defendants intended to induce Plaintiff and the Class, with respect to the Class, to rely on its misrepresentations and/or omissions.  Defendants knew that Plaintiff and the Class would rely on Defendants' misrepresentations and/or omissions regarding copay prices and as a result, would pay copayments higher than the actual prices for those prescription drugs.

106.    Plaintiff and the Class justifiably relied upon Defendants' misrepresentations and/or omissions in that Plaintiff and members of the Class would not have purchased prescription drugs for more than the cash prices, but for Defendants' misrepresentations and/or omissions.  Plaintiff's and the Class' reliance on Defendants' misrepresentations and/or omissions were, thus, to their detriment.

107.    As a proximate result of Defendants' conduct, Plaintiff and the Class have been damaged because they paid copayments for prescription drugs that were far higher than the prices they would have paid, but for Defendants' misconduct.

108.    Defendants are therefore liable to Plaintiff and the Class for the damages they sustained.

**Count V – Negligent Misrepresentation**

109.    Plaintiff realleges each and every allegation contained above as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

110.    Under the circumstances alleged, Defendants owed a duty to Plaintiff and the Class to provide them with accurate information regarding the prices of their prescription drugs.

111.    Defendants misrepresented and/or concealed the true copay prices of prescription drugs.  Defendants made such misrepresentations by reporting artificially inflated prices for such drugs to Plaintiff and the Class.

112.    Defendants had no reasonable grounds to believe that these misrepresentations and/or omissions were true.  The prices that Defendants reported to Plaintiff and members of the Class were substantially (and unjustifiably) higher than the prices charged to cash-paying customers.

113.    Defendants intended to induce Plaintiff and the Class to rely on their misrepresentations and/or omissions.  Defendants knew that Plaintiff and the Class would rely on Defendants' misrepresentations and/or omissions regarding copayment prices and as a result, would pay copayments higher than the actual prices for those prescription drugs.

114.    Plaintiff and the Class justifiably relied upon Defendants' misrepresentations and/or omissions in that Plaintiff and the Class would not have purchased prescription drugs for more than the cash prices, but for Defendants' misrepresentations and/or omissions. Plaintiff's and the Class' reliance on Defendants' misrepresentations and/or omissions were, thus, to their detriment.

115.    As a proximate result of Defendants' negligent conduct, Plaintiff and the Class have been damaged because they paid copayments for prescription drugs that were far higher than the prices they would have paid, but for Defendants' misconduct.

116.    Defendants are therefore liable to Plaintiff and the Class for the damages they sustained.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for relief and judgment against Defendants as follows:

A.      That the Court certifies the Class, under Fed. R. Civ. P. 23, appoints Plaintiff as Class Representative, and appoints her attorneys as Class Counsel to represent the members of the Class;

B.      That the Court declares that Defendants' conduct has violated, and continues to violate, the statutes and laws referenced herein;

C.      That the Court preliminarily and permanently enjoins Defendants from conducting business through the untrue, misleading, or deceptive business acts or practices, and other violations of law described in this Complaint;

D.      That the Court orders Defendants to implement whatever measures are necessary to remedy the untrue, misleading, or deceptive business acts or practices and other violations of law described in this Complaint;

E.      That the Court orders Defendants to notify each and every individual, who paid a copayment for medically necessary, covered prescription drugs above that prescription drug's cost, of the pendency of the claims in this action in order to give such individuals an opportunity to obtain restitution from Defendants;

F.      That the Court orders Defendants to pay restitution to restore to all affected persons all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or deceptive business act or practice or in violation of law, as described in this Complaint, plus pre- and post-judgment interest thereon;

G.      That the Court orders Defendants to disgorge all monies wrongfully obtained and all revenues and profits derived by Defendants, as a result of their acts or practices, as alleged in this Complaint;

H.      That the Court awards damages to Plaintiff and the Class;

I.     That the Court enters an Order awarding costs, expenses, and reasonable attorneys' fees; and

J.     That the Court grants such other and further relief as may be just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury for all issues so triable.

DATED:  November 11, 2016                    **GRAY & WHITE LAW**

  /s/ Jacob Levy
Jacob Levy
Mark K. Gray
713 E Martket Street #200
Louisville, KY 40202
Telephone:  502-210-8942
Facsimile:  502-618-4059
mgray@grayandwhitelaw.com
jlevy@grayandwhitelaw.com

Joseph P. Guglielmo (*pending pro hac vice*)
**SCOTT+SCOTT,**
**ATTORNEYS AT LAW, LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone:  212-223-6444
Facsimile:  212-223-6334
jguglielmo@scott-scott.com

Erin Green Comite (*pending pro hac vice*)
**SCOTT+SCOTT,**
**ATTORNEYS AT LAW, LLP**
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone:  860-537-5537
Facsimile:  860-537-4432
ecomite@scott-scott.com

E. Kirk Wood (*pending pro hac vice*)
**WOOD LAW FIRM, LLC**
P. O. Box 382434
Birmingham, AL 35238-2434
Telephone:  205-908-4906

Facsimile:  866-747-3905
ekirkwood1@bellsouth.net

Greg L. Davis (*pending pro hac vice*)
**DAVIS & TALIAFERRO, LLC**
7031 Halcyon Park Drive
Montgomery, AL 36117
Telephone:  334-832-9080
Facsimile:  334-409-7001
gldavis@knology.net

Andrew A. Lemmon (*pending pro hac vice*)
**LEMMON LAW FIRM**
P.O. Box 904
15058 River Road
Hahnville, LA 70057
Telephone:  985-783-6789
Facsimile:  985-783-1333
andrew@lemmonlawfirm.com

- and -

650 Poydras Street, Suite 2335
New Orleans, LA 70130
Telephone:  504-581-5644
Facsimile:  504-581-2156
andrew@lemmonlawfirm.com

Ryan K. Hicks, Esq. (*pending pro hac vice*)
131 East Laurel Street
P.O. Box 1162
Scottsboro, Alabama 35768
Telephone: 256-259-2004
Facsimile: 256-259-4188
ryankhicks@gmail.com

Brian C. Gudmundson (*pending pro hac vice*)
**ZIMMERMAN REED, LLP**
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone:  612-341-0400
Facsimile:  612-341-0844

*Attorneys for Plaintiff Margie Waldrop*